(No. 2087— )

V. O. CONNOR, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 14, 1935.*

ALBERT E. ISLEY, for claimant.

OTTO KERNER, Attorney General; CARL DIETZ, Assistant Attorney General, for respondent.

Mr. Chief Justice Hollerich delivered the opinion of the court:

On April 28, 1930 claimant entered into a contract with the respondent for the construction of an R. C. Girder Bridge, consisting of one steel span and four approach spans on S. B. I. Route No. 104, Section 143-b, in Christian County.

The proposal which was made a part of the contract, among other things provided as follows:

"The plans for the proposed work are those prepared by the Chief Highway Engineer and approved by the Director of the Department of Public Works and Buildings on July 11, 1930, which plans are designated as State Bond Issue, Route 104, Section 143B, Christian County and which cover the work described in Paragraph 1 in this proposal.

"The specifications are those prepared by the Department of Public Works and Buildings and designated as standard specifications for road and bridge construction adopted February 1, 1930."

Article 42.8, page 186, of the Standard Specifications for road and bridge construction adopted February 1, 1930 is in part as follows:

"The proportion of cement, fine aggregate, coarse aggregate, and water will be determined by the Engineer before the work begins so as to produce a workable plastic concrete having a compressive strength of not less than 3,500 lbs. per square inch, and a modulus of rupture of not less than 650 lbs. per square inch at the age of fourteen days when tested by standard methods. This determination shall be based upon tests of the aggregates selected by the contractor for use in the work. The quantities of aggregates for each batch of concrete shall be measured by weight.

"The Engineer will furnish to prospective bidders, upon request, the approximate proportions by weight necessary to produce concrete having the required workability and strength using aggregates from any established and available commercial source designated by the bidder, it being expressly understood that this information is only for the convenience of the bidder.

"The Engineer reserves the right to determine as the work progresses and as the aggregates are delivered at the site of the work the proportions of cement, water and the aggregates actually furnished which will produce workable plastic concrete having the strength specified herein."

Work under the contract was commenced about September 1, 1930, and the piers and abutments were poured during that Fall. Approach Span No. 1 was poured December 21, 1930; Span No. 2 on January 4, 1931, and Spans Nos. 3 and 4 were poured and the work completed during the summer of 1931. The contract price was $47,069.55 and was paid in full by the respondent.

The claim here involved grows out of the replacement of Span No. 1 which was rejected as defective, and which was thereafter removed by claimant and replaced by another span, pursuant to the order of the respondent. The cost of removal was $589.90 and the cost of replacement (exclusive of the cost of cement furnished by respondent) was $559.33, making a total of $1,148.93, which was paid and advanced by claimant, and which he seeks to recover in this proceeding.

No question is raised as to the cost of such removal and replacement, and it is stipulated herein between counsel for claimant and respondent that if the respondent is liable to the claimant because of the matters alleged in the declaration, the amount of damages to be allowed shall be $1,148.93, which stipulation is approved by the Engineer of Construction of the respondent.

As to Span No. 1 it appears that prior to the commencement of the work, the engineer of the respondent in charge of the work determined the proportions of sand and gravel to be used, to-wit, 328 pounds of gravel and 233 pounds of sand for each bag of cement, and set the scales accordingly. The weather at the time the span was poured, was very bad, the temperature ranging from 36 degrees to 17 degrees Fahrenheit. When the form was removed it was determined that the span was badly honeycombed and the engineer in charge ordered that it be removed and replaced. Claimant contends that the honeycombed condition of the span resulted from an improper mix given by the respondent and that the same was not the result of any fault on his part.

Respondent contends that there were other factors which caused or which contributed to or combined with the improper mix to cause the defective span. Respondent also contends that claimant's foreman in charge of the work was incompetent; that some of the workmen were local men and not familiar with work of that type; that the mix was not properly

spaded; that the weather was too cold; and there is some evidence in the record in support of such contentions.

It appears from the testimony of the witnesses for the respondent, that the mix in question would be suitable when all conditions were *ideal*. Conditions, however, and particularly the weather, were far from ideal, the temperature being well below the freezing point a large part of the time. The water had to be heated, and the work was not completed until about seven o'clock p. m.

Claimant testified that he spoke to Mr. Pennington, the resident engineer, about the time the work was commenced, and objected to the mix, but that nothing was done about it at that time. Mr. Pennington had no recollection of such objection, but would not say that it had not been made. It is undisputed, however, that after it was found that the first span was defective, the mix was changed for the other spans; that the mixtures used were more or less experimental; and that the mixture in question was an unusual and a hard working combination.

Mr. L. A. Lush, District Construction Engineer of the Department of Highways, testified that he had recommended that claimant be at least partially recompensed for his expense in tearing out and replacing this span.

Under the terms of the specifications, the proportions of cement, fine aggregate, coarse aggregate, and water were required to be determined by the engineer. The contractor had no right to change them. He had the right to object to them, but had no authority to make any changes therein. Claimant testified that he objected to the mix, and his testimony was not denied.

Upon consideration of all of the evidence in the record, it appears that the defective condition of the span resulted from the use of an improper mix under the prevailing weather and local conditions. Respondent's engineer was on the job and if the mix was not proper under the conditions then prevailing, he had the right to change it, but the contractor had no such right. As a matter of fact, neither party knew that the mix in question was improper until the forms were removed from the span, and the honeycombed condition thereof was apparent.

Under the circumstances the contractor was required to accept the proportions fixed by the respondent. If such pro-

portions were not proper under the conditions then prevailing, it was no fault of the claimant and he should not be required to. pay the expense connected with the removal and replacement of the defective span.

Upon the facts in the record claimant is entitled to an award, and inasmuch as the parties have heretofore stipulated that if claimant is entitled to an award, the amount of his recovery shall be Eleven Hundred Forty-eight Dollars and Ninety-three Cents ($1,148.93), an award is entered in favor of claimant for the sum of Eleven Hundred Forty-eight Dollars and Ninety-three Cents ($1,148.93).